STATE *v.* RONALD LIVINGSTON

(No. 6829)

Submitted January 20, 1931.   Decided January 27, 1931.

*Donald G. Lazelle,* for plaintiff in error.

*Howard B. Lee,* Attorney General, and *W. Elliott Nefflen,* Assistant Attorney General, for the State.

WOODS, JUDGE:

The defendant, who was found guilty of burglary, attacks the judgment of the circuit court of Monongalia county sentencing him to confinement in the penitentiary for a period of two years, on the ground that the verdict is contrary to the law and the evidence.

Perryapolis, Pennsylvania, the residence of defendant, is 43 miles north of Morgantown.   The coal property alleged to have been broken into is located at Rock Forge, a mining camp, three miles out of Morgantown.   The 2700 pounds of brass and copper (insulated copper cable, etc.) found in defendant's possession about daylight, Monday, October 28, 1929, was, according to state's evidence, in the buildings as late as seven o'clock Sunday evening, October 27, 1929.   Defendant asserts that he purchased the brass and copper, and that he never was in Rock Forge until after his arrest.

Monday morning, H. N. Rexroad, lieutenant of the department of public safety, stationed at Morgantown, received information from the state police of Pennsylvania at New Salem that they had arrested two men driving a Chevrolet truck loaded with copper and brass claimed to have been got in West Virginia. He proceeded at once to New Salem (having no knowledge at that time of the burglary at Rock Forge) to investigate, and was informed by defendant and his companion that the junk had been delivered to them at a point in Marion county three miles out of Fairmont, on the Clarksburg pike—approximately 22 miles from Morgantown. In the truck were found a pair of bolt cutters, hammers, coal chisel and a Stilson wrench, commonly known as a pipe wrench. On the bolt cutters the officers found a substance which looked like tar, "similar to what is around the copper cable and also some copper colored marks as though they had been cutting an insulated wire." The cable in the truck had been "freshly cut in two." Both men admitted that they did not have a West Virginia junk dealer's license, and that they had not notified the sheriff of Marion county that they were going to remove the junk from the state, as required by statute. They stated to Rexroad that a man, whose name they did not know, came to their garage, at Perryapolis on Friday and made arrangements to sell a truck load of brass and copper, and that they were to meet him Sunday evening at the point designated around 4 or 5 o'clock; that they were delayed on account of company, and did not get away from Perryapolis until late in the afternoon; and that they were flagged down between 7 and 7:30 that evening by "the unknown man" who had the junk on the edge of the road in a Reo Speedwagon. Thereupon, Rexroad took the two men to Fairmont and out the Clarksburg road, and had them point out the place of the alleged transfer. He states that he could see no evidence of a transfer at the place indicated. The men were then conducted to Fairmont, and placed in jail. Upon receipt of a report of burglary at Rock Forge, and identification of the brass and copper, the defendant and his

companion were brought to Morgantown, where they were later indicted and tried for that offense.

In addition to Rexroad's testimony, and the fact that the property was in place at Rock Forge Sunday evening, up to 7 or 7:30, as testified to by the watchman, who went through the buildings at that time, according to the regular routine, to put on the lights, we have the testimony of the superintendent and the watchman that they examined the buildings, early the next morning, and, in addition to the tracks of men, they noticed a "fresh" track of a diamond tread tire where one wheel of an automobile had gone into a ditch near the buildings. In speaking of the tracks the watchman said, "Well, the left hand tire, the front tire had them big diamonds on them just like a new tire would have and the other was smooth that pointed up the hill." He examined the front tires on defendant's trucks, but not the backs, at the time the copper and brass was identified. Upon being asked what kind of tires were on the front, he answered, "I am telling you, it was one of them big diamond tires and the other smooth and just the tracks is all I looked at."

The story as related by Rexroad, with exception of time, was practically admitted by the defendant and his companion on the trial. They both stated that the arrangements were to meet the "unknown man" Sunday evening (instead of 4 or 5 o'clock); that they met him about 8:30 (instead of 7:30); and that on their way to Fairmont they stopped and fixed the carburetor on the car of a Miss McGee of Morgantown, who, at the time, gave her full name and street address. Miss McGee was called as a witness to corroborate the defendant in this particular.

Why the difference in time? If the arrangement had been to meet the unknown man at 4 or 5 o'clock, he must have expected to have the junk at the point of meeting prior to that time. The property could not be in two places at the same time. If we accept the statement of the watchman that he went into the buildings to turn the lights on between 7 and 7:30 P. M., the junk could not have arrived at the point of delivery agreed upon until some time later that evening. According to defendant's own statement, it took 45 minutes

to transfer the junk from the "speed wagon" to the truck when backed end to end. Longer time must have been required in removing it from the building and loading it at the coal property. Even if the defendant and his partner were in the vicinity of Fairmont, as testified to by Miss McGee, they had plenty of opportunity to drive out to Rock Forge from Morgantown, load the stolen property, and be 36 miles north of Morgantown by daylight Monday morning.

While the possession of the copper and brass, as defendant contends, is not sufficient in itself to establish a *prima facie* case of defendant's guilt, yet it is a strong circumstance, which a jury is warranted in considering in connection with the other facts in the case. *State* v. *Powers*, 91 W. Va. 737; *State* v. *Reece*, 27 W. Va. 375; *State* v. *Heaton*, 23 W. Va. 773. Here the defendant and his partner were found in possession of goods which had been removed from the coal properties, by breaking and entering, sometime after 7 o'clock the night before; they admit having been within three miles of the scene of the burglary; the tire tracks and the tires of the truck tended to show that the truck in which the stolen goods were found had been at Rock Forge; the condition of the bolt cutters; the impossibility of goods being in two places at the same time; and the transaction with an "unknown man," in the face of a statute requiring proper records to be kept in dealing in such class of junk, and failure to notify the sheriff that the goods were being removed from the state (Chapter 68, Acts 1929), all tend to connect the defendant with the crime charged. We believe that the evidence, although circumstantial, was sufficient to make a case for the State.

As stated in *State* v. *Winans*, 100 W. Va. 421: "This Court has time and again held that where there is evidence tending to incriminate, the jury is almost uncontrollably the judge of its force and weight, and of the proper inferences from the facts proven. *State* v. *Burner*, 94 W. Va. 634; *State* v. *Sullivan*, 55 W. Va. 598; *State* v. *Musgrave*, 43 W. Va. 672; *State* v. *Bowyer*, 43 W. Va. 180; *State* v. *Hurst*, 11 W. Va. 54." The jury have found against the defendant, and the

trial court has approved of their verdict. The judgment therefore must be affirmed.

*Affirmed.*