1. "Fraud may not be presumed, but, being in itself subtle, slight circumstances may be sufficient to carry conviction of its existence." Code, § 37-706. "Great inadequacy of consideration, joined with great disparity of mental ability in contracting a bargain, may justify equity in setting aside a sale or other contract." Code, § 37-710. Under the latter principle, a deed may be set aside in equity, on proof of the two elements stated, "without proof of anything else" as to fraud. Pye v. Pye, 133 Ga. 246 (65 S.E. 424). A fortiori, the same rule would apply with at least equal force in case of such mental disparity and a total absence of consideration. Code, § 20-107; Witt v. Sims, 140 Ga. 48
(5a) (78 S.E. 467).
2. The petition in this case alleged: "That if the signature of the said Mary Pitman was procured to said alleged deed, same was without consideration and there was and is no consideration for the same, and same was procured by the said defendant through fraud and undue influence practiced upon her by the defendant, he being a practicing attorney, a college graduate, and a lawyer of experience and ability, and she being bedridden at the time, eaten up with cancer, and about eighty or eighty-two years old, and illiterate, and unable to read or write. That if it should be shown that she signed the same, the procuring of said deed and of her signature to the same was and is a fraud upon the said Mary Pitman and upon your petitioner, practiced by the defendant, and said deed is void and same should be canceled by a court of equity." Held, that as against a general demurrer these allegations were sufficient to show such fraud on the part of the defendant as would, if proved, authorize a cancellation of the deed. See, in this connection, Causey v. Wiley, 27 Ga. 444; Stanley v. Stanley, 179 Ga. 135 (175 S.E. 496); Trustees of Jesse Parker Williams Hospital v. Nisbet, 191 Ga. 821 (2) (14 S.E.2d 64).
(a) The foregoing allegations do not constitute bare allegations of fraud without stating facts, so as to bring the case within the rule stated in Manget Realty Co. v. Carolina Realty Co., 169 Ga. 495 (1) (150 S.E. 828), and similar cases.
3. Also, the allegation, made on information and belief, "That the said Mary Pitman did not sign said deed conveying said property to the said Frank Stow and that the same is not her act and deed," was sufficient, as against a general demurrer, to show that the deed was a forgery. Allen v. Allen, 196 Ga. 736 (7), 747 (27 S.E.2d 679). As to the right to cancellation on this ground, see Code, § 37-1407; Smith v. Burrus, 139 Ga. 10 (1) (76 S.E. 362).
4. Notwithstanding the deed had been recorded, the plaintiff was not required to file an affidavit of forgery under the Code, § 29-415, but could assail its genuineness by the above-quoted allegation, thereby assuming the burden of disproving its genuineness. Haithcock v. Sargent, 145 Ga. 84
(88 S.E. 550).
(a) The court did not err in overruling the general demurrer to the petition. Echols v. Green, 140 Ga. 678 (4) (79 S.E. 557).
5. Forgery, like fraud or any other fact, may be proved by circumstantial *Page 736 
evidence. Cowart v. Strickland, 149 Ga. 397 (3, 4, 5) (100 S.E. 447, 7 A.L.R. 1110).
6. While the evidence as to declarations, claimed to have been made by Mary Pitman to the effect that she had not made a deed to any one before executing the deed to Will Mayfield (original plaintiff), was hearsay and without probative value as against the defendant, it was apparently admitted without objection, and the mere fact that such evidence was admitted would not vitiate the verdict. As to the effect of such declarations, see Blalock v. Midland, 87 Ga. 573 (5) (13 S.E. 551); Dozier v. McWhorter, 117 Ga. 786 (4) (45 S.E. 61); Higgins v. Trentham, 186 Ga. 264 (1) (197 S.E. 862).
7. Nor would the fact that some of the evidence was merely impeaching in character, and therefore could not be considered for the purpose of establishing an affirmative contention (Watts v. Starr, 86 Ga. 392, 12 S.E. 585), afford cause for setting aside the verdict if it was otherwise supported.
8. The credibility of a witness is a matter to be determined by the jury under proper instructions from the court. Code, § 38-1805. "Where a disinterested witness, who is in no way discredited by other evidence or his own, testifies from his own knowledge to a fact which is not in itself improbable or in conflict with other evidence, the witness is to be believed, and the fact testified to is to be taken as legally established. But this does not mean that the jury is bound in every case to accept evidence as true although it is not contradicted by direct evidence. It may be inherently subject to discredit, or so from the circumstances." Lewis v. Patterson, 191 Ga. 348, 357 (12 S.E.2d 593).
9. The evidence as to the "contract", which the defendant claimed was signed by Will Mayfield, including comparison of signatures, presented an issue for determination by the jury as to the genuineness of such instrument. Code, §§ 38-701, 38-708, 38-709; Gibson v. Gibson, 54 Ga. App. 187 (2) (187 S.E. 155).
10. There was sufficient competent evidence, though circumstantial in nature, to authorize a finding in favor of the plaintiff, either that the deed under which the defendant claimed was without consideration and was procured by fraud as alleged, or that it was never in fact executed by the purported grantor and, under the evidence, it was a question for the jury as to which if either of these attacks was sustained. Since both theories were thus supported by evidence, there was no error in submitting both issues to the jury for their determination.
11. The evidence did not demand a finding, upon any theory, that the plaintiff was barred for failure to do equity. The evidence authorized the verdict, and the court did not err in refusing a new trial.
Judgment affirmed. All the Justices concur, except Atkinson, J., who dissents, and Candler, J., disqualified.
On February 6, 1942, Will Mayfield filed suit against Frank B. Stow for the cancellation of a deed. Both claimed under deeds purporting to have been executed by Mary Pitman. Prior to the institution of the suit Mary Pitman died. She was not named as a party in the original petition. During the pendency of the suit Will Mayfield died, and his widow, as administratrix, was made a party plaintiff in his stead. She then obtained an order making the administrator of Mary Pitman a party defendant. The petition alleged: Mary Pitman was an old woman about 80 years of age with no children, and was confined to her bed and helpless as a result of cancer. About August 1, 1941, she made an agreement with Will Mayfield to come to her home, care for and nurse her as long as she lived, to pay all bills and funeral expenses, and in consideration therefor she would deed him her house and lot. He performed his agreement. Under her part of the agreement, and to carry out the same, she executed a deed to him on November 7, 1941. She died December 30, 1941. On November 10, 1941, when he had the deed recorded in the clerk's office, he learned that there was a deed to the same property already on record from Mary Pitman to Frank B. Stow, dated September 27, 1941, and recorded October 8, 1941. In regard to this deed, the petition stated: "That your petitioner alleges upon information and belief that the said Mary Pitman did not sign said deed conveying said property to the said Frank B. Stow, and that the same is not her act or deed." The petition further alleged: "That if the signature of the said Mary Pitman was procured to said alleged deed, same was without consideration and there was and is no consideration for the same, and same was procured by the said defendant through fraud and undue influence practiced upon her by the defendant, he being a practicing attorney, a college graduate, and a lawyer of experience and ability, and she being bed-ridden at the time, eaten up with cancer, and about eighty or eighty-two years old, and illiterate, and unable to read or write. That . . if it should be *Page 738 
shown that she signed the same, the procuring of said deed and of her signature to the same was and is a fraud upon the said Mary Pitman and upon your petitioner, practiced by the defendant, and said deed is void and same should be canceled by a court of equity." It was further alleged that the petitioner had been in possession of the premises since the date of his deed.
The prayers were for process, injunction, that the deed be canceled as a cloud on the petitioner's title, and for general relief.
A general demurrer was overruled, and exceptions pendente lite were taken. The only grounds of the demurrer were as follows: "First. Defendant demurs to said petition, upon the ground that the allegations therein show no cause of action against the defendant, and there is no cause of action set out in said petition. Second. Defendant demurs to said petition upon the ground that said petition does not set out any matter or thing of equity or equity jurisprudence, and that upon the allegations therein the plaintiff is not entitled to the equitable relief prayed for."
On the trial the jury found for the plaintiff. A motion for new trial was made and amended, and to the overruling of same a bill of exceptions was filed. All grounds of the amended motion for new trial were mere amplifications of the general grounds, except ground 4, as set forth in the amendment, in which the movant complained of the following portion of the judge's charge to the jury: "If you believe the conveyance to Stow is not a valid conveyance, if you believe it was procured by fraud, if you believe the plaintiff has established that fact by a preponderance of the evidence; if you believe the so-called conveyance to Stow is invalid, or if you believe the deceased, Mary Pitman, did not actually execute the deed to Stow at all, if that fact has been established by the preponderance of evidence under the rules of law that have been given you in charge, then your finding would be in favor of the plaintiff." It was alleged that this charge was erroneous, because there was no evidence to authorize it, either as to whether the deed was procured by fraud or as to whether Mary Pitman did or did not actually execute the deed to Stow, and that said charge in effect summed up contentions of the plaintiff which were not supported by evidence, and told the jury, if they found as summarized, then their "finding would be in favor of the plaintiff." *Page 739 
The following is a sufficient statement of the evidence for the purpose of considering the judgment refusing a new trial.
The plaintiff introduced original deed records showing record of the deeds under which the plaintiff and the defendant respectively claimed. It appeared that the deed under which the plaintiff claimed, that is the deed from Mary Pitman to Will Mayfield, was executed on November 7, 1941, and recorded November 10, and that it was signed "Mary Pitman, her mark," and was witnessed by W. P. Martin and Mabel Adderholdt, notary public; that the deed or instrument under which the defendant claimed recited a consideration of $200, bore date September 27, 1941, and was recorded October 8, 1941, and was signed "Mary Pitman, her mark." The witnesses were Myrtle Moore and Lee Crow, notary public.
It was stipulated that Mary Pitman died December 30, 1941 and Walter Chamblee was appointed her administrator; and that letters issued to him June 26, 1947. Also, that Will Mayfield died January 17, 1946, and Goldie Mayfield was appointed administratrix by order of the Court of Ordinary of Hall County; and that letters issued on August 19, 1946.
Mrs. R. L. Landers testified as follows: I have known Aunt Mary Pitman ever since I can remember, before I ever moved over there. I live in the house just beyond where Aunt Mary lived, going out the highway from here. She had a cancer of the breast during the last part of her life. I think she was confined to her bed in September before she died. Bill Mayfield, a negro man, waited on her, after she took her bed; he would be waiting on Mary when I would be there. I saw him washing her clothes and cleaning the house. Will dressed her wounds every night, so far as I remember. Aunt Mary said she wanted Will to have what she had; said she wanted the one that waited on her in her last days to have what she had.
Mildred Mealer testified as follows, on direct examination: I live at 118 West Ridgewood, here in Gainesville. I knew Mary Pitman during her lifetime; she was eighty or eighty-five years old when she died of cancer; she was ill five or six months at home before she died. Aunt Mary worked for my grandfather and grandmother, and we had been out there often, and I had *Page 740 
taken her food, and I gave her money and helped her with her medicine when she was sick. Will Mayfield was with her five or six months. She was bedridden five or six months before she died. Aunt Mary died about December 30, 1941. When I went to see Aunt Mary before her death and while she was bedridden, Will Mayfield was waiting on her, taking care of her; he fed her and bathed her and kept her as well as he could; he washed the clothes; it was necessary that her wounds be dressed often; it was a very delicate task, very unpleasant and hard, just a nursing job. Will's wife was related to her, and it seems she was not able to take care of her, and Will did go and take care of her, and she said that he had just nursed her like a baby. I heard her tell Will she would give him what she had if he would wait on her; I heard her say that several times, because she was grateful to him and she said he was the only one that could handle her, pick her up and lift her up and do things that were necessary to be done. I don't know when I first heard her say that; she said it several times; I think the first time I saw him there, she said it. On cross-examination: If Mrs. Landers said she took her bed in September, I feel that it is correct; she was close by and would know about that.
H. J. Brock testified on direct examination: I am forty years old. I knew Aunt Mary Pitman when she lived; I had known her about twenty-five years when she died. I had some dealings or conversation with Mr. Frank Stow about Aunt Mary; Aunt Mary used to stay with my father and said she wanted him to have her property, and if he died, wanted it to go to his children. My father died about twenty years ago; and I seen Col. Stow here in town, and I asked him what about going out and fixing those papers; he said he would try to get out there in a day or two, and I come back to town in about two weeks and asked Col. Stow if he had been out there, and he said "No, I am going to try to get out there in a day or two." And when I come back I asked Mr. Stow did he go out there, and he said he never had been out there, and I just come to the clerk's office of court to see if there was anything against her property. I found a deed there made to Frank B. Stow. Then I went to see Col. Hammond Johnson and got him to go out there with me; we went out *Page 741 
there and asked Aunt Mary, did she sign any papers to Frank B. Stow and she said she didn't; and we asked her did she touch a pencil, and she said she didn't, and she raised her hand and said she didn't touch any pencil. I never heard her say where her deeds were. That is about all I know about it. On cross-examination: I asked Mr. Stow, "What about going out there and fixing those papers," and he said he would. I found the deed on record about two weeks after he made the deeds.
Mrs. Myrtle Mealer Walker testified as follows: I knew Aunt Mary Pitman in her lifetime. Before she died, she lived beyond New Holland. I have been out there a number of times; I would go every week or so and sometimes oftener. The last part of Aunt Mary's life she was an invalid, in bed right at the last, helpless, bedridden. I think she took her bed in September, 1941. I saw this man Will Mayfield, waiting on her when she was bedridden. I do know that Will was out there and waited on her and I do know that Aunt Mary said she wanted him to have her property and what she had. As I understood it, Aunt Mary was Will's wife's aunt. I don't know anything about her making Mr. Stow a deed for $200 in cash; nor about Mr. Stow hiring Will Mayfield to stay there and take care of her.
W. P. Martin testified on direct examination: I am a practicing attorney; I knew Will Mayfield and Aunt Mary Pitman during their lifetimes. I drew a deed for Aunt Mary and got Miss Mable, and went out there and she signed the deed with her mark; I witnessed the deed as one witness and Miss Mable as a notary public. After I had read the deed where it said he would give her a Christian burial, she said, "Will you see that he carries that out?" and I said "Yes, I will, Mary." I asked her when I first got there before I asked her to sign the deed, I said, "Mary, is this property yours?" and she said "Yes," and when she asked me about her interest in it and I said, "Have you made a deed to anybody?" and she said "I have not." She said she had promised her property to Will if he waited on her and buried her when she died. On cross-examination: I remember that was in the early fall, but looking at the copy deed it was about November 7. She was helpless, so far as helping herself was concerned. I had the deed drawn on information I had from Will; *Page 742 
but she did ask me to read the deed over to her, and I read it twice to her while she was lying there flat on her back and couldn't get up at all, so she said.
Boyd Crow testified as follows: I have lived at New Holland forty-four years. I knew Aunt Mary Pitman during her lifetime. Aunt Mary died with cancer; she lay there several months before she died. I think she was in bed three or four months before she died; the first I knew of her being so bad off was in August or September, I think of the same year she died in December or January.
Mrs. Mabel Whiting testified on direct examination: I went out with Mr. Martin to Mary Pitman's house to witness a deed; mostly Aunt Mary was just telling me how good Will was to her and she had given him her little tract of land. She said there was no deed or anything against the property, it was just hers. On cross-examination: I had not seen her before that day, nor since. As to knowing whether she made a contract with Mr. Stow to take care of her — just her word that she hadn't made a contract with anyone is all I have.
Mrs. Frank Coker testified: I lived across Ridge Road from where Aunt Mary lived in her lifetime. I have known her twenty-five or thirty years. My husband, Frank Coker, carried her to the doctor one Sunday afternoon; I never knew of her being out of the house after that; my husband had to help her in and out of the car, she was almost helpless. Mr. Coker took her to the doctor, it could have been in the summer, in July, but not later than the 15th of August. As far as I know, that was the last time she ever left home; she didn't get Mr. Coker to carry her anywhere else.
Mrs. Beulah Waldrip testified on direct examination: I lived in New Holland in a house in sight of Aunt Mary; I have known her since 1901; we lived there close by and I saw her continually from 1901 on. The last three or four months before she died, her condition was bad; it was real bad, but she could get about but she got past going for at least four months. I think Aunt Mary died December 30, 1941. On cross-examination: She was pretty bad from September to December 30 when she died; she went to bed in September. *Page 743 
Goldie Mayfield testified as follows: Aunt Mary made a deed to Will and I always kept these other papers of hers; those deeds were with Will's deeds, when Will died; I kept them all together among Will's things. Will died January 17, 1946; he went to live at Aunt Mary's place the first Sunday in August, 1941; he stayed there until he died; he was living in some other part of town. I had waited on Aunt Mary before Will went over there to wait on her; I am not so stout, and I was not able to wait on her and I went home and that left her all alone; Will went over there the first Sunday in August, 1941, and stayed there until she died on December 30, 1941. Aunt Mary said she couldn't read or write; I think Aunt Mary was eighty years old; she had a cancer for four years before she died; she had cancer when I waited on her, before Will went there; she was in bed; she never did get down on the floor and walk; I went before Will did and she never did take a step after I got there; she was never able to walk out of her room. Additional testimony of Goldie Mayfield is set forth later in this statement.
The plaintiff rested.
Lee Crow testified on direct examination: As to going out to Aunt Mary Pitman's, Col. Frank B. Stow called me and asked me, would I go and notarize some papers for him and I told him, "Yes, I reckon so." Mrs. Myrtle Moore, I believe Frank married her since then, was driving the car, and they carried me out there to a colored woman's house, Pitman, I believe her name was. I notarized the papers and he gave her some money. I understand Mrs. Myrtle Moore married the defendant not long ago. We went in his automobile; when we got there, Colonel read a land deed to the woman, she couldn't sign her name, she just had to hold the pen, and I notarized the papers; that is all I heard said, and I come on back to the automobile then and left Col. Stow and the lady there, I don't know her condition; she was sitting up in bed; I left the room because of the odor, soon after the deed was read and signed and witnessed; she held the pen and signed it by a mark; then Mrs. Moore signed and I signed as a notary public, State at large. At that time Mr. Stow gave her some currency, but I don't know how much; I don't know what happened to the money; when I left, Frank gave her *Page 744 
the money; she took the money and looked like she might have put it under the pillow. He read the deed over to her before she signed it. On cross-examination: I don't remember having a conversation with Mr. Hammond Johnson February 12 or 13, in front of my pool room; I don't remember him asking me if I witnessed the deed, and that I said, "I did witness it;" I don't remember him asking me where Aunt Mary was when she signed it; he did say something to me about selling the property, I don't know what it was; I did not tell Mr. Johnson she signed the deed in Mr. Stow's office. As far as I remember that didn't happen, nothing like that happened at all. We went out to Aunt Mary's house and stopped the car right there in front of her house; I sat in the back seat; I presume it was Mr. Stow's car; Mrs. Myrtle Moore was driving it; I don't remember the date, nor the day of the week or month; I don't remember whether it was in the afternoon or morning, because I go out on a lot of other cases; folks come and carry me and bring me back, and I don't remember whether it was morning or afternoon.
Mrs. Myrtle Moore Stow testified on direct examination: I married Frank Stow May 17, 1947; we were not married when this case was tried in `41. I knew where Aunt Mary Pitman lived because I had been out there numbers of times before she made those deeds and carried her medicines. I knew Frank B. Stow for some time before this occurred; he had a room at my mother's at No. 412 East Spring Street; he got his meals up town, just had a room in the house; he had a car. We had been out there four or five different times and carried her medicine before the deeds were signed. I had not talked with her before then; I had just been to the door; she was in bed and I didn't go in. The afternoon she signed those deeds, I had the car and I asked Frank to let me go, so I went; I went by his office, and he said he and Crow were going out of town, and we set out in front and Crow came and got in the car; I drove the car; we went out to Aunt Mary's and we went on the inside, and Crow signed the paper, and then he come on the outside and I sit there in the room with him for a few minutes, and he read the deed over to her and she used her mark because she couldn't write. When she did that, he gave the deeds to her and gave her some money; *Page 745 
told her how much it was and she put it under her pillow, and also said she wanted to know if he would take care of her and bury her and all, and he told her he would. He asked her to have Will Mayfield come by and collect his money at the office, and she said she would tell Will to come by and get it. I stayed in there a few minutes and come on out and left Stow in there with her. When we got there, Mr. Crow and Stow walked in before I did, as well as I remember. Of course, he asked her how she was and talked to her a few minutes; she asked him if he had those papers and he told her he did have the papers; she said she wanted the deeds and wanted those deeds fixed up, because she did want to be taken care of and buried just like her husband was. Mr. Stow read the deed to her, and she took the money and put it under her pillow; I didn't count the money; it was in bills; he told her it was two hundred dollars, and she took it and put it under her pillow; then she signed the deed by her mark and I signed as a witness and Crow signed. And Will Mayfield came out and Mr. Crow told him to come on up to the office and get his money and he said he would; Stow told Aunt Mary to have him come up to the office and get his money, two hundred dollars, and she said she would tell him. She told Mr. Stow that she nursed him when he was small, when they lived in Dahlonega; she said she expected Frank to take care of her, because she took care of him when he was a baby. I went out there numbers of times after that with Frank Stow; Will Mayfield was out there numbers of times and talked to Stow; I didn't pay any attention to anything said between them. He always told Will when he carried medicine out there and he knew about that. I noticed an unpleasant odor in the room; I stepped out of the room first. I was not at home the afternoon Aunt Mary died; my mother, Mrs. Bertha or Mrs. Hugh Moore, had to take the message. We went out there as soon as we come home, to Aunt Mary Pitman's and waited out there for Stow to come and move the body. When I come in, my mother just told me Aunt Mary Pitman was dead and for me to call the undertaker, and he called the undertaker and went right on out there that afternoon. Frank B. Stow called the undertaker, D.C. Stow, from my home. My mother is not able to come to court; they took *Page 746 
her deposition at the house when this case was tried. I don't remember if Crow or I witnessed the deed first; we both signed after she signed it. On cross-examination: Will Mayfield was not there the afternoon we signed the lease; I said Will Mayfield came out numbers of times when we were there; that same afternoon I didn't see Will Mayfield; that was in the afternoon, I don't know what time; I don't know the day of the week; I suppose it was the day the deed was dated; I don't know if it was Saturday afternoon. I was not working anywhere at that time; I was not working at Bill Sole's cafe; I have worked there. If Mr. Stow testified before Judge Candler I didn't go out there with him but one time, he was mistaken, because I have been out there more than one time. When Aunt Mary signed the deed, Mr. Crow and I were in the room. Mr. Stow read the deed when Mr. Crow and I were in the room; and Mr. Stow was in there; I don't remember what was said, or anything. I don't remember Mr. Hammond Johnson coming to see me about this matter. If this deed is signed Myrtle Moore, that was me; that was my name at the time; I had been married; I was going by the name of Moore; I was not married at the time. I had married Wood before that; I was not married to him at that time; I didn't marry him until June, 1942. I married McGowen before and he lives in Florida; it was several years ago; I got a divorce from him in Florida, about fourteen years ago. I hadn't married Mr. Wood before June `42; I married Wood in June `41 or `42; I don't remember making a statement that he and I had been married before that. Wood went to the Army in June `42, after we were married. When we went out there that afternoon, we stopped the car in front of the house; we got out; I don't remember what time in the afternoon it was; after we got back in the car we come on back in town, brought Mr. Crow straight back to town; if I am not mistaken, we come back the Athens Street way; we stayed on Ridge Road and did not come back by New Holland; we didn't stop anywhere. If Will Mayfield came by Stow's office, I don't know when it was. This deed was signed at Aunt Mary's home.
D.C. Stow testified on direct examination: I am funeral director here in Gainesville and have been in business about *Page 747 
forty-three years, and was such in `41. I knew Aunt Mary Pitman who lived on Ridge Road; I had charge of her funeral; I was called one afternoon by Mr. Frank Stow, defendant, to come over there and take charge of the body and bury it, and I went ahead and prepared the body, and he told me what to do and I prepared the body and buried it. No one else called me to bury Aunt Mary; nobody but Mr. Stow arranged for the expense. I think the funeral bill was $88. I am not sure. On cross-examination: No one had anything to do with paying the funeral expenses except Mr. Frank Stow, until two or three years later when this woman come over. There was some time it hadn't been paid; Frank was away from here; I just wanted to know what the arrangements would be made about it. Will was living in the house and I tried to get him to pay it, because he was a tenant in the house. Frank Stow made all arrangements and assumed the funeral bill. I saw Mr. Hammond Johnson, his lawyer, a time or two about paying it, or getting Will to pay it. Mr. Frank Stow was away working in the shipyard; I don't know what he made. Frank Stow paid me about a year ago. Goldie Mayfield came to me, I don't know how long after that, and asked about it, some colored woman, I don't know who she was, she told me her name, and I told her the bill was paid. I don't know if that is she over there. As to whether Stow had paid it at that time, we hadn't had a settlement, I owed him some money.
Goldie Mayfield, on being recalled, testified on direct examination: After Will died, I was appointed administratrix to go on with the case; then I went to see Mr. D.C. Stow to ask him about the exact funeral expenses; I wanted to pay it because Will promised to pay it; I am his wife and I wanted to carry out what he promised to Aunt Mary; Mr. Stow told me this other man had paid it just a few days ago, that is, Mr. Frank B. Stow. On cross-examination: As to offering to return the $200 that Mr. Stow paid Will — I didn't know he paid anything; I didn't know he paid Aunt Mary $200. No one ever offered to repay him that I know of.
Hammond Johnson testified as follows: About the 12th or 13th of February, 1942, I saw Mr. Lee Crow, who has testified on the stand and whose name appeared to be signed to this deed, *Page 748 
and asked him if he witnessed the deed and he said, "Yes." I said, "Did you see Aunt Mary sign it?" and he said "I sure did." I said, "Where did she sign it, Mr. Crow," or "Lee?" and he said, "Right up there in Col. Frank Stow's office." We were standing at that time in front of the pool room on Main Street, and I pointed up to the old State Bank Building where Stow had an office at the time, and I said, "You mean that office right up there?" and he said "Yes, right there in that office." When Mr. Brock come to me to see about the record, we looked at the record and it appeared in that deed "Frank B. Stow," like it is now, and it was signed "Mary Pitman — his mark," it didn't say "her mark." I am not certain whether the original deed was in there at the time or not. I went to Mary Pitman's house; what took place was about what Brock testified on the stand, as I recollect it. I went over there for the purpose, as Brock said, of asking two things; the first was whether she ever made a deed to Stow; and second was whether she wanted to make a deed or any sort of paper conveying her house and lot to Brock's children; and when I got over there she was in a very deplorable condition. She was in bed with ropes hanging down from the ceiling up above there that she used to pull herself up by; and as has been testified, there was quite a bit of odor around there naturally from the disease she had; and I asked her first, if she had ever made a deed, and she said she had not, that her deeds were all over there in her trunk, that nobody had her deeds, they were right over there in her trunk; and then, although I didn't have much heart in it, seeing the condition she was in, I asked her if she wanted to make a deed to the Brock children, and she said she was not in a condition to do anything and she was trusting in the Lord to take care of her.
Frank B. Stow, sworn by the plaintiff for the purpose of cross-examination, testified as follows: I remember testifying in the interlocutory hearing in this case before Judge Candler [in February, 1942]; then I said nothing about this contract; I said just as little as I could at that hearing. I was not trying to keep them from enjoining me from selling the land, I didn't especially care whether they enjoined me or not. I was letting it rock along until I could get a trial; I didn't mention this contract; it was *Page 749 
real late in the afternoon, and Will Mayfield came to my office after he was off from work, so he said. I don't remember the date. If I testified it was Saturday afternoon, it was Saturday afternoon, because that was a lot earlier in the case than this is. I never testified at the same time that Mrs. Myrtle Moore didn't go out there with me but one time, because she was there with me several times. I had been going to Aunt Mary Pitman's quite a while before that Brock boy ever come to me, and he came to me and said, "Ain't you handling Aunt Mary's affairs?" and I said, "I am trying to see that Aunt Mary gets the medicine she needs and the necessities of life." That contract is not witnessed; Will came into my office late that afternoon, I typed it out, paid him the $200, put a place there for a witness, and went to the Postal agency next door to my office to get somebody to witness it, and there was no one there, and Will said, "Well, you have got my signature, and I have got the money; it don't make any difference anyhow." My office was on Main Street next to the Postal, in the State Building. That was the same afternoon the deed was signed; those records will show the date. I didn't look for anyone to witness the deed (contract?) after I went to the Postal place; in fact I didn't think there would be anything to it; the man got his $200 and Aunt Mary got hers, and the funeral expenses were arranged for. As to this being the first time I have mentioned that paper in court — this is the first time we have had a real trial on the case; I knew the case couldn't be finally disposed of on an interlocutory hearing; it wouldn't have served any purpose on the interlocutory hearing to mention the contract, there was no use going into it; it wouldn't have mattered whether I had title to the land; I think the judge would have enjoined me if I had shown title to the land, until a jury could pass on the question; they usually do, where there is a question of fact. I finished Jesup High School, and Emory Academy at Oxford, and finished Mercer with an LL.D., and lacked a few hours of having my A.B. degree; I got my law degree in 1926; I have practiced continuously since that time with the exception of two years, ten months and thirteen days, then I was a civilian employee with the Navy Department during the war; I left Gainesville July 2, 1943, and came back here the 13th day of May 1946. As to testifying for Mr. Lee Crow that there was *Page 750 
a lease which it was claimed was lost — I testified as to having the lease which I would testify for any man I ever drew a lease for; the lease was turned over to Mr. Crow, I didn't lose the lease. I testified for him in that case. That case went against Crow, and a new trial was granted and is pending in this court now.
I testified to nothing about the lease except what was the truth. This Brock boy came to see me before Aunt Mary made me this deed, before she mentioned anything at all about disposing of her property. Brock come to me and asked me, "Are you tending to Aunt Mary Pitman's affairs?" I said, "Other than looking after her to see that she gets the necessities of life and medicine, I am not," and he said "Well, she promised to give my father that place, and I want to see if I can get a deed out of her for the children," and I said, "Brock, I don't have anything to do with that; if you want that done, you will have to go see Aunt Mary yourself." I said, "She has never mentioned the disposition of her property to me," and up to that time she had not; it was at a later date she mentioned that to me. He saw me some time after that, and in my office both times; he never asked me on the street, and the other two times he asked me the deed hadn't been made to me; he never saw me after the deed was made to me, and it was at her own suggestion that deed was made to me. I first told my original counsel about this agreement with Will Mayfield when I carried my file over to him a year or so ago; that is my present counsel. Mr. Telford has seen this contract, I don't recall when, but since I have been back in Gainesville, because he didn't have my file; he had a file and I had a file, it had been in my file the whole time. I don't know if Mr. Telford knew about it when we had this hearing before; I had never showed it to him or called it to his particular attention.
The document referred to in the foregoing testimony of Frank B. Stow as "this contract" was a paper in the form of a receipt and contract, which was purported to have been signed by Will Mayfield without witnesses on September 27, 1941, acknowledging receipt of $200 from Frank B. Stow, and agreeing for such consideration to care for and wait on "Aunt Mary Pitman" from this date until her death, to keep the said Frank B. Stow advised as to her condition, and to notify him if and when her death occurs, in order that the said Frank B. Stow may arrange for the decent *Page 751 
and Christian-like burial of the body of said Aunt Mary Pitman. The paper was typewritten all except the signature, "Will Mayfield," which was in script and was made with pen and ink.
This paper was introduced in evidence by the defendant without objection on the part of the plaintiff. The defendant also introduced in evidence the signature of Will Mayfield to the affidavit attached to the original petition, for the purpose of comparing his handwriting as shown by that affidavit with the written signature upon the paper next above described.
Goldie Mayfield, widow and administratrix of Will Mayfield, testified with respect to the signatures upon these two papers. She first testified: "Aunt Mary couldn't write, but Will could; this affidavit to the petition is his handwriting; also this paper dated September 27, 1941." On being recalled, after the plaintiff had rested, the same witness testified: "As to Will signing that — that is not exactly like Will's; I see it better now than I did before; that `W' is not made exactly like his. I don't know for sure if this is Will's signature;" the latter testimony apparently referring to the paper dated September 27, 1941.
The originals of these two papers, to wit, the affidavit to the petition filed in this case, and the "contract" dated September 27, 1941, including the signature upon each as introduced in evidence, were attached to and made a part of the bill of exceptions.
Hammond Johnson further testified: After seeing Mr. Lee Crow about the witnessing of that deed, I went to see Mrs. Moore, as I understood her to be at that time, and I had understood she worked at Mr. Bill Sole's cafe, and when I went there, they said she had gone to Terrell's Beauty College, and I went up there and saw the young lady, and I says, "They have a deed here in this case I am interested in, that your name appears on as a witness; I would just like to ask you whether or not you signed it as a witness or saw Aunt Mary Pitman sign it," and she said, "Well, I am going with Mr. Stow at this time and he is my friend and I don't want to have anything to say in it," and that was the information she gave me. At the hearing before Judge Candler on February 21, 1942, Mr. Stow testified that at only one time did he and Mrs. Moore go out to Aunt Mary's together.
It was stipulated between the parties that Mr. Hammond Johnson, attorney, offered to pay Frank B. Stow $88 on August *Page 752 
24, 1946; $116.66, which was $88 with interest at 7 percent from December 30, 1941, up to that date; and that Mr. Stow said he could not take it.
After the case reached this court, Pauline Hargrove, as administratrix de bonis non of Will Mayfield, was made a party defendant in error on motion of counsel for the original defendant in error, showing that Goldie Mayfield, who as administratrix was the original defendant in error, had died on December 27, 1947.