STATE OF WEST VIRGINIA

V.

MELVIN LOVELESS

(No. 10859)

Submitted May 1, 1957. Decided June 18, 1957.

*D. J. Savage, John L. Goshorn,* for plaintiff in error.

*W. W. Barron,* Attorney General, *Giles D. H. Snyder,* Assistant Attorney General, for defendant in error.

GIVEN, JUDGE:

Defendant, Melvin Loveless, was indicted by a grand jury of Logan County, December 8, 1955, as an accessory before the fact of the murder of Sarah Reed. Trial of defendant on the indictment resulted in a verdict of "guilty of Accessory before the fact to Murder in the first degree", with recommendation. The Circuit Court of Logan County, on January 3d, 1956, sentenced defendant "to the Penitentiary of this State for and during the remainder of his Natural Life".

Two prior indictments against defendant had been returned by grand juries of Logan County, charging defendant with the same offense charged in the indictment

returned in December, 1955, under which he now stands convicted. The first indictment was returned May 11, 1953, at the regular May term of court, by the regular grand jury, and the second indictment was returned on June 8, 1953, at the same term of court, by a grand jury specially called. At the time the grand jury returned the indictment in June, no order discharging the grand jury which returned the indictment in May had been entered. In so far as the record speaks, therefore, the two grand juries were functioning at the same time. Defendant was tried twice, twice found guilty, and twice sentenced to death, on the indictment returned in June. The judgments sentencing defendant were set aside by this Court. The first trial was had at the term of court at which defendant was first indicted. The second trial was had at the first regular term of court held in Logan County subsequent to the setting aside of the first verdict. Three regular terms of court were not held in Logan County between the time this Court set aside the verdict returned at the second trial and the time the verdict involved on this writ of error was returned. The opinions of this Court in the cases wherein the two verdicts were set aside are reported in *State* v. *Loveless*, 140 W. Va. 875, 87 S. E. 2d 273; *State* v. *Loveless*, 139 W. Va. 454, 80 S. E. 2d 442. The facts of the homicide, and the evidence of defendant's supposed connection therewith, are carefully and fully set out in those opinions. However, since the testimony in the instant case relating to defendant's guilt was not the same as the testimony given at the prior trials, and since in the instant case a question is raised as to the sufficiency of the evidence to support the verdict returned, we must here attempt to detail the evidence tending to establish guilt of defendant as charged in the indictment of December, 1955.

The murder of Sarah Reed occurred at Logan, on Wednesday, April 29, 1953, at about two thirty o'clock in the morning, in rooms occupied by Nelson Beatty, on the second floor of an apartment building, during a burglary of the rooms, by James Rufus Jones, Eugene Sherman,

Charles Edward Ford and Albert K. Puckett. Sarah Reed, an employee of Beatty, was the only person in the rooms when broken into by those who committed the burglary. She died from the effects of a bullet fired from a gun by one of the persons who committed the burglary. Jones and Ford were jointly tried on a murder charge, convicted and sentenced to the penitentiary for life. Puckett and Sherman entered pleas of guilty to a charge of murder, and received like sentences.

On the day before the homicide, Loveless and others implicated in the burglary, sometimes herein referred to as defendants, were in and about the Loveless Hotel in Charleston, a hotel operated by the defendant Loveless. The automobile of Loveless was parked near the hotel a large part of the day, and the hotel and the automobile were undoubtedly used during a part of the day as general meeting places for at least some of the persons who were planning, and who later committed, the burglary. There appears no question that Loveless was in and about the hotel on that day, and in and out of the automobile a number of times, in conversation with other defendants. During the day, April 28, 1953, one of defendants, Puckett, called Loveless from Roanoke, Virginia, about twelve o'clock noon, and asked Loveless: "Are you going to get that bread tonight?"; and Loveless replied, "I haven't heard from the other people * * * Call me later and I will let you know". It was explained that "bread" was intended to refer to the money expected to be obtained by the burglary. A later call was made from Martinsville, Virginia, and Loveless directed Puckett and Williams, another person involved, to "come to Charleston", which they did. Both Puckett and Williams were nonresidents of West Virginia and were unfamiliar with the streets of Charleston, Puckett never previously having been in Charleston. On arriving at Charleston, "between ten and ten-thirty" in the evening, they parked their automobile, a 1952 Ford equipped with a Cadillac motor, at a service station, and went directly by taxicab to the Loveless Hotel. When Puckett "got out of the cab" at the Loveless Hotel, he "saw Melvin get out of

the automobile". Loveless then provided food for Puckett and Williams, after which, in a very short time, Loveless, in his own automobile, drove the four defendants who committed the burglary to the service station where Puckett and Williams had left their automobile. At that point, some of defendants got into the Puckett-Williams automobile and continued their journey to the point where the burglary was committed. No witness testified that Loveless actually drove his own automobile to Logan on that evening, but it is not questioned that the defendants who rode to the service station with Loveless were at the scene of the crime when it was committed. After the homicide, "everybody involved" met in a room in the Loveless Hotel, where the money obtained in the burglary, about six hundred dollars, was divided, Loveless receiving part thereof.

On the Sunday before the Wednesday of the homicide Loveless went to the home of the mother of Eugene Sherman, one of defendants, and inquired for Sherman. Later, Barbara Harris, an employee at the Loveless Hotel, at the instance of Loveless, made another such inquiry. Being informed of the inquiries, Sherman went to the Loveless Hotel, where he found Loveless. Loveless then, in his own automobile, with Eugene Sherman, drove to the Ferguson Hotel, located in Charleston, for the purpose of contacting the defendant Ford, and the three then drove to Logan in the automobile of Loveless. They visited the Elk's Club at Logan, which was near the apartment wherein the rooms occupied by Beatty, the place where the homicide occurred, were situated. While at the club, Loveless asked an employee, "Where was Mr. Beatty?" Ford and Sherman inquired of a lady at a restaurant near the Elk's Club "where Beatty's apartment was at, and she showed us, right down below the Elk's Club there". Under a pretense of using a toilet, Ford and Eugene Sherman "went up stairs * * * to look it over", and were ordered out of the apartment building. The numbers of the Beatty rooms previously had been furnished to Ford and Sherman. The three, after Ford and Sherman were

ordered out of the building, immediately left Logan and returned to Charleston.

There is other evidence which indicates that Loveless and some of the other persons involved in the burglary had, for some time, contemplated such a burglary as that committed at the Beatty rooms, at some point between Keystone and Charleston, where they "would have to go in and take the money"; that Loveless indicated they would probably obtain "between forty and fifty thousand dollars"; and that the place at which the burglary was contemplated was that of Nelson Beatty. We think, however, that the evidence detailed above entirely justified the verdict returned, and that we need not further consider such other evidence. It is impossible to believe, we think, that Puckett and Williams, nonresidents, would have driven to Charleston, arriving at ten or ten thirty in the evening, gone directly to Melvin Loveless, started within approximately one hour to the point where the burglary was to be committed, about seventy miles distant, and participate in the offense, with no definite, prearranged plan of operation. It is also impossible to believe, from the activities of Loveless during the day and before, as detailed, that he was not one of the persons who meticulously planned the execution of the burglary, in the commission of which the homicide occurred. It is certain that he, in his own automobile, transported the persons who committed the burglary to the service station, on their way from the Loveless Hotel to the place where the burglary was committed. It appears, without doubt, we think, that if the jury believed the witnesses testifying to the effect indicated, as the jury evidently did, the guilt of defendant was established beyond every reasonable doubt, to the exclusion of every reasonable hypothesis of innocence. See *State* v. *Bowles,* 117 W. Va. 217, 185 S. E. 205; *State* v. *Livingston,* 110 W. Va. 21, 156 S. E. 842; *State* v. *Wilson,* 74 W. Va. 772, 83 S. E. 44; *State* v. *Bowyer,* 43 W. Va. 180, 27 S. E. 301.

We have not, of course, failed to examine the evidence offered on behalf of defendant, sharply in conflict with

that offered on behalf of the State, and vigorously contended to be sufficient to establish defendant's innocence. Nor have we failed to give consideration to the questions raised as to the veracity of certain witnesses of the State. We find nothing in the record, however, which required the jury to consider the witnesses of defendant more truthful than the witnesses who testified in favor of the State. There is nothing in the record that we can discover so unreasonable or improbable as to compel disbelief of the testimony of any of the witnesses. In such circumstance, the final determination of the veracity of the witnesses is exclusively for the jury. See *State* v. *Bowles,* 117 W. Va. 217, 185 S. E. 205; *State* v. *Mc-Callister,* 111 W. Va. 440, 162 S. E. 484; *State* v. *Hayes,* 109 W. Va. 296, 153 S. E. 496; *State* v. *Winans,* 100 W. Va. 418, 130 S. E. 607; *State* v. *Sullivan,* 55 W. Va. 597, 47 S. E. 267; *State* v. *Bowyer,* 43 W. Va. 180, 27 S. E. 301.

Certain facts necessary to understand the controlling questions will be detailed in the consideration of the respective questions discussed. The propositions to be discussed are: (1) Whether defendant was prejudiced by the action of the trial court in overruling his motion for a change of venue; (2) whether the indictment returned in June, 1953, was void for the reason that it was returned by a grand jury specially called at a time when a grand jury, regularly called, was functioning in Logan County, the answer to which question depends on whether two grand juries may function at the same time, in the same county; (3) the contention that the defendant Loveless must be discharged and forever freed from prosecution as to the offense for which he stands convicted, for the reason that three regular terms of court had passed after the return of the indictment of May 11, 1953, without defendant having been afforded a trial, the contention being based on the theory that the indictment returned in June, 1953, was void and that the previous trials of defendant were mere nullities; (4) whether defendant was prejudiced by requiring him to plead to the indictment in the presence of the twenty

veniremen called to the jury box for his trial, after the
veniremen had been placed in the jury box and sworn
to answer questions; (5) whether the trial court com-
mitted reversible error in admitting certain testimony
given by the witness Hicks; (6) whether the trial court
erred in refusing to call certain witnesses; and (7)
whether the trial court erred in the manner of instruct-
ing the jury as to the consideration of certain evidence
of Eugene Sherman, called as a witness by the court.

In *State* v. *Loveless*, 140 W. Va. 875, 87 S. E. 2d 273,
the question of the right of the defendant to be granted
a change of venue is fully discussed. We find no sub-
stantial difference in the material facts supporting de-
fendant's motion for a change of venue in the instant
case, and the material facts supporting a like motion
made in the previous case, unless the difficulty encounter-
ed by the trial court in the qualification of the jurors who
tried defendant in the instant case constitutes such dif-
ference. The evidence shows that approximately two
hundred seventeen prospective jurors were called to the
jury box before the panel of twenty veniremen was ob-
tained. A very large proportion of that number were
found not qualified for the reason that they had formed
opinions as to the guilt or innocence of defendant.
Others were found disqualified for the reason that they
possessed conscientious objections to the infliction of
the death penalty in any circumstance.

After carefully reviewing all the pertinent evidence
supporting the motion, we think the facts established
do not constitute such a clear showing of the right of
defendant to be granted a change of venue as to require
this Court to say that the trial court abused the wide
discretion vested in it in the consideration of such a mo-
tion. See authorities cited in the opinion in the prior
case against Loveless, cited above. We think the defend-
ant was not prejudiced by the overruling of the motion.

No decision of this Court settles the question whether,
in this State, in the same county, two grand juries may

function concurrently. The Fifth Amendment of the Federal Constitution provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury", except in cases not here material. Section 4 of Article III of our State Constitution provides that "No person shall be held to answer for treason, felony or other crime, not cognizable by a justice, unless on presentment or indictment of a grand jury." No constitutional provision undertakes to define specifically what shall constitute a legal grand jury, or to provide the time or manner of its constitution or functioning. Only the right to have a grand jury make the charge as to the crimes designated is guaranteed. Of necessity, therefore, we must look to the common law, as it existed at the time of the adoption of the Federal Constitution, to determine whether a grand jury is legally constituted and whether its organization and actions satisfy the guarantees contained in the Constitution, more specifically, whether two grand juries may function at the same time, in the same county. See discussions in *Eastham* v. *Holt, Judge,* 43 W. Va. 599, 27 S. E. 883, 31 S. E. 259. There is no implication, of course, that the Legislature does not possess power to legislate as to the manner or time of the calling or functioning of grand juries, as exemplified by Article 2 of Chapter 52 of the official Code of West Virginia. This Court has often recognized the power of the Legislature to do so. See *State* v. *Carduff,* 142 W. Va. 18, 93 S. E. 2d 502; *State* v. *Risk,* 139 W. Va. 380, 80 S. E. 2d 226; *State* v. *Howard,* 137 W. Va. 519, 73 S. E. 2d 18; *State* v. *Stafford,* 89 W. Va. 301, 109 S. E. 326; *State* v. *Hoke,* 76 W. Va. 36, 84 S. E. 1054, 26 A.L.R. 1494n; *State* v. *Wetzel,* 75 W. Va. 7, 83 S. E. 68, L.R.A. 1916D, 1127n, Ann. Cas. 1918A, 1074; *State* v. *Carter,* 49 W. Va. 709, 39 S. E. 611.

The only statutory provision appearing to have any possible pertinency to the question involved is the provision found in Code, 52-2-1, reading: "* * * Any circuit court may, at a special, regular or adjourned term thereof, whenever it shall be proper to do so, order a grand

jury to be drawn and to attend such term. A grand jury summoned to attend a special, regular or adjourned term may consider any offense against the laws, whether the same shall have been committed before the next preceding term of the court or not, and whether the accused shall have been held for trial or not prior to the next preceding regular term * * *".

In 1 Chitty's Criminal Law 310, in a discussion of the question here posed, we find it stated that "* * * The practice varies in some degree in particular counties, thus, in Middlesex we have seen, that every term there are two grand juries summoned and sworn before the senior of the puisne judges, on some day fixed by such judge in the early part of the term; who, after receiving their charge from such judge, adjourn to the grand jury room, and then appoint subsequent days of meeting; and the precepts are issued from the crown-office to the constables in the different districts, to make returns of all nuisances, &c. which, on their return, are considered as presentments, and are prosecuted as indictments or presentments. The two juries appoint separate days for receiving the constables' returns. The jury who receive the presentments of constables for the more remote parts of the county assemble at the grand jury room, to find indictments on the last day but two of the term; and the jury acting for the metropolis and the adjacent parts, in the like respect, assemble at the like place, for the same purpose, on the last day but one of the term: and after returning their respective presentments and indictments, the jurors are discharged. In Suffolk also, there are two grand juries chosen * * *".

In 2 Hale's Pleas of the Crown 26, it is stated: "But if there be a general commission of *oyer* and *terminer*, or gaol-delivery, or peace for the whole county, and a special commission of the same nature to a liberty, hundred, or other precinct, as in a hundred, liberty, or franchise within the county, and both bear *teste* the same day, they all stand. Thus it is in *Suffolk*, where there have been always three commissions of gaol-de-

livery to the justices of assize, one for the county at large, another for the franchise, another for the town of Bury, and they impanel several grand juries, and sit and act respectively by each commission."

In *The Queen* v. *McGuire,* 34 N. B. 430, 4 Can. Crim. Cas. 12, it is stated, in a concurring opinion, that "* * * It appears that at common law more than one Grand Jury was summoned, for three attended in some counties, such as Middlesex, in which county there were three hundred, and for each hundred there was a Grand Jury, and in some counties two * * *".

In the *Appeal of Messano,* 16 N. J. 142, 106 A. 2d 537, the Court held, in effect, that two grand juries may exist simultaneously in one county. While it is true that the holding is founded, principally, at least, on a statute, the fact remains that the statute was not held violative of either the State or Federal Constitution. The Court, in its opinion, pointed out that "Additional grand juries were not unknown at common law".

The authorities quoted clearly justify the conclusion that two grand juries often functioned at the same time, in the same county, at common law. For additional authorities supporting that conclusion see *People* v. *Manahan,* 32 Cal. 68; *Shenker* v. *Harr,* 332 Pa. 382, 2 A. 2d 298; *State ex rel. Doerfler* v. *Price,* 101 Ohio St. 50, 128 N. E. 173; Annotation, 121 A.L.R. 814.

Since we hold that the indictment on which defendant was tried was a valid indictment, we need not consider at length his contention that he should be freed and forever discharged as to the offense for which he stands convicted, on the theory that three regular terms of court were held after his indictment on May 11, 1953, without having been afforded a trial. See Code, 62-3-21. Clearly, in the circumstances detailed, defendant was afforded two trials at such times as to prevent the application of the inhibition contained in the statute against further prosecution. See *State* v. *McIntosh,* 82 W. Va. 483, 96 S. E. 79; *State* v. *Strauder,* 11 W. Va. 745, 27 Am.

Rep. 606; *Commonwealth* v. *Adcock*, 8 Gratt. 661, 49 Va. 661.

In *State* v. *McIntosh, supra,* special pleas were filed on behalf of defendant, alleging that defendant should be discharged from further prosecution for the reason that he had not been accorded a speedy trial, "agreeably to the constitutional provision guaranteeing prompt trial in criminal cases". A statutory provision similar to the statute here relied on was considered. Two indictments against defendant were pending. The Court held: "4. In the case of two such indictments, the accused is not entitled to count under said statute, any term at which he procured a continuance of either indictment on his own motion, or otherwise prevented a trial thereof." It can not be reasonably contended that terms of court occurring during the pendency of the writs of error granted defendant should be considered in determining the question whether defendant had been accorded a speedy trial, either under the statute or the constitutional provision.

Defendant contends that he was prejudiced by the action of the trial court in requiring him to be arraigned in the presence of twenty veniremen called for his trial, after the veniremen placed in the jury box had been sworn to answer questions. The indictment was read to defendant in the presence of the prospective jurors. We can not see any possible prejudice to defendant by such procedure. The veniremen would, necessarily, be informed, substantially, at least, of the charge and the plea thereto, by the examination on their voir dire and, if later qualified as jurors, would necessarily be fully informed of the charges contained in the indictment and required to fully consider such charges. See Code, 56-6-16; *State* v. *Goins,* 120 W. Va. 605, 199 S. E. 873; *Garrett* v. *Patton,* 81 W. Va. 771, 95 S. E. 437.

The next assignment of error to be considered relates to the admission of certain evidence of the witness Hicks, called by the State. Hicks was permitted to say, in answer to questions propounded by the prosecuting attorney, that he had talked with Ford "about this twenty

or forty thousand dollars"; that he, the witness, and Ford "went around to Melvin Loveless's but Melvin wasn't in"; and that he, the witness, "went to see Melvin after I talked to Ford, after Ford talked to me". The court overruled a motion to strike the evidence, remarking that "If he doesn't connect it up, it will be struck out". The evidence was not later stricken. The contention of defendant is that since defendant was not present at the time of the conversation concerning which the testimony related, it was "completely hearsay" and "highly prejudicial" to defendant. We think there is no substantial merit in the contention. The evidence was not hearsay. It related only to a fact, definitely within the knowledge of the witness, that he and Ford had talked, and did not purport to repeat or give any statement made by Ford.

Some of the persons who had been convicted of charges growing out of the burglary, and who had been sentenced to the penitentiary, including Eugene Sherman, before the trial in the instant case, indicated to the prosecuting attorney, or at least the prosecuting attorney had reason to believe, that their testimony, if given at the trial of defendant in the instant case, would be materially different from that given by them at former trials. In such circumstances, and for the reason that the State did not believe it should vouch for the truthfulness of such witnesses, the prosecuting attorney moved the court to "call to the stand one or more of the three witnesses, three of the principals in the commission of the offense * * * which resulted in the death of one Sarah Reed". Counsel for defendant stated to the court: "I see no objection to it"; that it would be defendant's "vigorous contention * * * whatever these witnesses say * * * previous statements by them, or anything I show as previous statements by them, will go solely and exclusively as to their credibility." Thereupon, the court called Eugene Sherman as a witness and, after having asked his name, permitted the State first, then the defendant, to fully cross-examine the witness. Much of the evidence given at former trials, fully supporting the

theory of the State, was by the witness declared to be false, and some of the material facts testified to in the trial of the instant case were directly in conflict with testimony previously given, and which supported the theory of defendant. In this circumstance, the prosecuting attorney was permitted to read to the witness testimony of the witness given at former trials, and the witness was required to answer whether he gave such former testimony, the answers usually being in the affirmative.

Defendant contends that the statements of the witness given at former trials, read to the jury, and highly damaging to defendant, could not be considered by the jury as tending to prove guilt, but only for the purpose of impeaching or contradicting the witness. We do not reach the question. While it is true that the Court did at first rule that the former testimony could be considered for the purpose of establishing guilt of defendant, that ruling was changed and the jury was orally and finally instructed, at the time of the completion of the testimony of Sherman, "to consider the testimony of the witness who just left the stand, any statements he may have made heretofore, all of these statements that have been read, including the statement made right after his arrest, other statements made and evidence given on the other two trials be considered by the Jury as going to his credibility, it goes to his credibility as a witness only". In view of such precise and positive instruction, defendant could not possibly have been prejudiced. See *State* v. *Flint,* 142 W. Va. 509, 96 S. E. 2d 677; *State* v. *McCauley,* 130 W. Va. 401, 43 S. E. 2d 454.

The further contention is made on behalf of defendant to the effect that he was prejudiced by the action of the trial court in refusing to call as witnesses of the court other principals in the burglary. The contention appears to be based on the premise that the court having called one of the principals, it was under a duty to call all of them. We see no basis for prejudice to defendant. The other principals were available as witnesses. They could have been called by the defendant if he had

so desired. He was deprived of no testimony. As pointed out in a previous opinion in one of the cases against Loveless, a trial court is sometimes warranted, and may, at times, have a duty to call a witness in a criminal case. It is there also pointed out, however, that in the exercise of such right great danger of unduly and improperly influencing a jury exists, and that the right should be exercised cautiously. We see no prejudice to defendant in the instant case, either in the action of the trial court in calling Eugene Sherman or in refusing to call other witnesses.

Six instructions offered by the State were read to the jury. Defendant complains that certain of such instructions were abstract, and that it was reversible error for the court to have failed to instruct the jury specifically as to the possible verdicts which could be found under the indictment. No instruction was offered by defendant as to the possible verdicts. We have carefully examined the instructions given on behalf of the State, and the twelve instructions offered and given on behalf of defendant. We think the jury was fairly and fully instructed, and that no prejudice resulted to defendant as to any of such instructions, or as to the action of the court in failing to give further instructions. As to the charge for which defendant was tried, only two verdicts, guilty or not guilty, were possible. In that circumstance, the jury could not have misinterpreted their duty as to what verdict should have been found.

We have carefully examined other questions briefed. Some of them are sufficiently answered by the conclusions stated herein. No substantial question exists as to the others. We find no prejudicial error. On the contrary, we are of the view that defendant has been accorded a fair, exceedingly fair, and impartial trial, in accordance with applicable principles of law. The judgment of the Circuit Court of Logan County must, therefore, be affirmed.

*Affirmed.*