## AUSLEY *et al.* v. CUMMINGS *et al.*

1. There was no error in overruling the demurrers to the petition of the plaintiffs, except as to one matter, which will be dealt with below.
2. It is not proper language to be employed in a petition that the plaintiffs, upon investigation, discovered that a named one of the defendants "had lied as to the supposed transactions had with" a stated person. On objection duly raised by demurrer and motion to strike, this language should have been stricken from the petition. But under the peculiar facts of this case, the failure to do so will not require a reversal.

3. There was no error in overruling either of the motions to continue the case.

4. While during the examination, as a witness, of a defendant who was charged with having perpetrated a most peculiar and flagrant fraud, the presiding judge put a number of questions to him, some of which tended to bring out evidence showing his bona fides or mala fides, yet, in view of the unusual evidence which the witness had given in his own behalf, and of the character of the case, the examination by the court was neither so argumentative in character nor contained such expressions or intimations of opinion as to require a reversal.

5. There was no abuse of discretion in taking up this case for trial in advance of some others which were on the calendar.

6. An agent to buy and resell property for his principals can not lawfully make a secret profit from the transaction; nor is it necessary to the application of this rule that the principal must show actual or moral fraud. The charge to the jury on this subject was applicable to one aspect of the case.

7. If an agent for the purchase and resale of property for his principals fraudulently represented to them that the purchase-price was a stated sum, when it was much less, and thus procured them to pay more than the full price of the property, when he led them to believe that they were only paying for a three-fourths undivided interest therein, and he took the excess and caused the deed to be so made as to convey the other fourth interest to his uncle, who was held out as being a purchaser to that extent, though he paid nothing, and the uncle in turn conveyed the one-fourth undivided interest in the land to the father of the agent, who later conveyed it to a purchaser for value, who resided in another State (the agent receiving the proceeds of this sale), if the uncle and father, with knowledge of the fraud, made the last-mentioned conveyances, they would be liable, with the unfaithful agent, to account to the principals.

8. The charge of the court limited the extent of the recovery which the jury might find to stated amounts; and this limitation was such as to restrict the jury to an amount which was clearly recoverable, if a recovery should be had by the plaintiffs. Possibly the limitation was hurtful to the plaintiffs. It was not injurious to the defendants; but tended to render some of the other questions raised immaterial, by excluding a recovery as to an amount involved in them.

9. None of the other grounds of the motion for a new trial require discussion or a reversal, in the light of the evidence and the charge as a whole.

AUGUST 18, 1916. REHEARING DENIED SEPTEMBER 23, 1916.

Equitable petition. Before Judge Cox. Decatur superior court. May 2, 1915.

*T. S. Hawes* and *W. V. Custer,* for plaintiffs in error.

*E. M. Donalson, M. E. O'Neal, W. M. Harrell,* and *Little, Powell, Smith & Goldstein,* contra.

LUMPKIN, J. A more extraordinary case than this rarely finds its way into court. Some of the salient features of it, which the jury could find from the evidence, were as follows: T. A. Ausley, a real-estate agent, pretended to W. E. Smith and his associates that a certain plantation in Florida could be bought for an amount somewhat in excess of $40,000, that it was partly planted in pecan trees, and that by setting out other trees it could be sold to R. E. Vinson for $185,000, payable in installments. As a means of inducing them to make the trade, he led them to believe that Vinson had deposited $4,000 in a bank in Bainbridge, Georgia, for the purpose of making the first payment. In fact no such person as Vinson had any dealing with the bank. T. A. Ausley placed with the bank his own note for $4,000, indorsed by J. C. Mc-Caskill, and arranged for the use of that amount if needed. He was to be paid by the purchasers for representing them in the transaction. Later one of the intended purchasers decided not to enter into the trade, and Ausley obtained his uncle, McCaskill, to be substituted as the fourth man. He also secured a $2,000 reduction from the purchase-price named, so as to make it apparently $42,400. The vendor lived in Brundidge, Alabama. When the time for closing the matter arrived McCaskill did not go to Alabama, but T. A. Ausley stated to the plaintiffs, who went there, that his father, J. C. Ausley, who lived in Alabama, would represent McCaskill, and would pay the amount due for his one-fourth interest. An attorney for Vinson (employed by T. A. Ausley) went with the party. The elder Ausley joined them on the road, and went with them to Brundidge, but did not go with them to an office where they went, saying that he would go ahead and arrange about the payment of the one fourth of the money for the McCaskill interest; and after that he was not seen again by the plaintiffs. There was some little delay in examining and preparing papers, and in investigating the title to a certain part of the land, so that the transaction was not finally closed at that time, but the plaintiffs placed in the bank at Brundidge three fourths of what purported to be the purchase-price, that is $31,800, in checks, which was to be paid over to the vendor, one Waters, as soon as the title was arranged to the satisfaction of the attorney, in regard to the small portion of the land mentioned. The two plaintiffs who were present returned home. They did not em-

ploy a separate attorney, being willing to rely on the examination and satisfaction of the one whom they understood had been employed by Vinson. Later the matter which caused the delay was arranged satisfactorily to the attorney, and a deed was executed by Waters to the plaintiffs and McCaskill. When executed it purported to be on a consideration of $42,400. (Waters testified that it was between $40,000 and $44,000.) Subsequently this amount was so changed in the deed as to read $15,000, to prevent the land from being assessed too high for taxation, as a witness testified. Neither McCaskill nor J. C. Ausley paid anything. In fact the vendor had agreed for T. A. Ausley to sell the property for $20,000 cash, and, if he should make a sale for more, he could have the excess. When the matter was closed at the bank in Brundidge, none of the plaintiffs being present, the vendor received the purchase-price of $20,000 in full payment; and the balance placed in the bank by the plaintiffs in checks (as they were informed by T. A. Ausley, to pay three fourths of the purchase-price), amounting to $11,800, was delivered to T. A. Ausley, or sent to him through the banks. There was evidence that J. C. Ausley offered to give a check for McCaskill's one-fourth interest, but was told that it was unnecessary, as the vendor had been paid all he claimed. Of the $11,800 turned over to T. A. Ausley by the bank, $4,000 was used to take up his note indorsed by McCaskill, which was in the bank at Bainbridge, and served in place of the supposed deposit by Vinson; and, after payment of the attorney's fee, $50, $250 as the first payment to T. A. Ausley for his services, and $500 as a first payment for fruit-trees contracted for, to be planted on the place, the balance of $3,200, was equally divided among the three plaintiffs and McCaskill, each receiving $800. A short time later, when a second payment from Vinson fell due, T. A. Ausley exhibited what purported to be a telegram from Oakland, California, stating that Vinson had died and had been buried there on a previous date. Later he exhibited another telegram that an agent or representative would be out in a short time to deal with the matter. This was signed with the name of B. T. Vinson. Smith, one of the plaintiffs, sent a telegram to the mayor of Oakland, and received an answer that no such person as Vinson had been buried there. There was testimony that Ausley later admitted that the purported telegrams were fakes. In

fact the evidence tended strongly to show that there was no such real person as Vinson; but that he seemed to be one of those mythical characters frequently spoken of but never seen, like Sairey Gamp's Mrs. Harris, in Dickens's novel of Martin Chuzzlewit. Although T. A. Ausley claimed to have seen him several times in Bainbridge, he testified that he first accidentally met a man in the hotel at a very early hour in the morning, who was waiting for a train, and who informed him his name was Vinson, and that from this the negotiations began. He did not know that Vinson had ever registered at any hotel, nor was any way shown by which he could be identified. The attorney who examined and drew the papers testified, that on one occasion while three men were talking with T. A. Ausley, as the witness approached he was told by Ausley to "shake hands with Mr. Vinson;" that afterward Ausley informed him that Vinson had to leave town; and that on his behalf (as Ausley alleged) Ausley arranged with the attorney to examine and prepare the papers. This was the only time the attorney ever saw any person purporting to be Vinson. McCaskill testified that before he was connected with the transaction some one pointed out a man standing on the sidewalk as Vinson. No other witness save T. A. Ausley claimed to have seen this man who was making a trade involving $185,000. Much of the evidence indicated that Vinson was either a myth or a dummy, probably the former. After he had been disposed of by a pretended burial in California, the sum of $500 was paid by the plaintiffs to the nurseryman for a release from the contract to furnish pecan trees, which had been made by them and McCaskill in the firm or joint name of the Christmas Pecan Company. Discussions were had as to what should be done, and whether T. A. Ausley should be prosecuted, but this was not done. McCaskill took part in some of these discussions, but later made a quitclaim deed for the one-fourth interest, which the deed from Waters had vested in him, to J. C. Ausley, the father of T. A. Ausley. J. C. Ausley later, under negotiations by T. A. Ausley, conveyed this one-fourth interest to a purchaser in Florida, who was not shown to have had any notice of the transaction (though the deed to him was made by J. C. Ausley after this suit was filed), and who paid a valuable consideration, all which T. A. Ausley received. Subsequently the plaintiffs paid about $5,000

to the holder to get back his one-fourth interest, to prevent a partitioning of the land.

The plaintiffs filed the present equitable petition showing the concealed profit and interest which their agent, T. A. Ausley, had acquired, first by reason of the $11,800 which he had induced them to put up as their share of the purchase-money, in addition to the entire purchase-price of the property, and which had been received back by him after paying for the whole property; and second, because of the one-fourth undivided interest in the property, the title to which had been conveyed to McCaskill, who paid nothing for it, and had later been conveyed by him without consideration to J. C. Ausley.

McCaskill asserted his entire innocence of any participation in any fraud or notice thereof. He contended, that he had relied on the representations of T. A. Ausley; that he indorsed a note of the latter in bank without knowing anything about the use to which it was to be put, as he had sometimes indorsed notes for his nephew before; that when he learned of what had happened, he took the advice of an attorney, and, under that advice, made a conveyance of the one-fourth interest which the original deed had conveyed to him, to J. C. Ausley; and that he did this so as not to have anything more to do with it. He conceded that he was liable for $125, and said he did not know to whom the $800 he held belonged. On behalf of J. C. Ausley it was contended, that he was innocent of fraud or notice thereof; that he had offered to pay into the bank in Alabama the money representing the one-fourth interest to be conveyed to McCaskill; but that he had been informed that it was unnecessary to do so. He was not present at the trial, nor was his testimony introduced. T. A. Ausley denied any fraud, and claimed that he was not the agent of the plaintiffs to buy, but that he sold to them, and was only their agent to resell to Vinson. Under the evidence and charge of the court, the jury found against McCaskill $125, with interest (which evidently represented one fourth of the amount paid to the nursery company for a release from the contract which had been made with it, and which amount McCaskill conceded that he was willing to pay), and against McCaskill and T. A. Ausley for $800, with interest (apparently being the part of the $4,000 which had been paid to the former), and against T. A. Ausley, McCaskill,

and J. C. Ausley for $6950, with interest, to which sums the court in his charge limited the jury in their finding. The defendants moved for a new trial, which was refused, and they excepted. In this court it was represented that McCaskill had been adjudicated a bankrupt, and a motion was made that the trustee be made a party. An order was granted making him a party. Error was also assigned upon the overruling of a demurrer to the petition.

1. There was no error in overruling the demurrer, except as to one ground which is mentioned below. The charge of the court limited the jury, if the plaintiffs should recover, to finding certain amounts, thus in effect eliminating the prayers for certain other relief; and they became practically immaterial.

2. The plaintiffs alleged that upon investigation they discovered that one of the defendants, T. A. Ausley, "had lied as to the supposed transactions had with" the alleged Vinson. A special ground of demurrer raised objection to this, substantially on the ground that it was improper language to be used in pleading, and should be stricken. The ground was overruled. Such language in a petition is improper. Its use is not a mere matter of taste, as argued by counsel for the defendants in error. It is a matter involving proper conduct, with respect to pleading, on the part of the officers of court, or persons taking part in a litigation. If a court should allow one party in his pleadings to call another a liar, the adversary might well claim the right to respond in similar language with the addition of an expletive adjective. Such words tend to create disorder, if not violence; and if the court permits them to be used, a trial may readily degenerate into a brawl. It is the duty of the court to require parties and attorneys in their pleadings and proceedings before it to conduct themselves decorously. If the present case were a close one, we might feel it necessary to reverse the judgment on this ground. But, as will appear, it is not a close one; certainly not as to the defendant as to whom the allegation was made. By his own evidence he placed himself in a most unenviable light. A witness testified that the defendant's own father had characterized him as a liar. The evidence shows beyond any reasonable doubt that he was guilty of the grossest fraud; and a verdict against him was overwhelmingly supported, if not quite demanded, by the evidence. Under the facts, we do not think that a reversal should be had

on account of the failure to strike the clause of the petition containing the harsh language mentioned.

3. A motion for a continuance was made on the ground of the sickness and absence of J. C. Ausley, one of the defendants. Evidence was introduced by both sides as to his condition, and there was also evidence as to former continuances. The motion was overruled, and we can not say that there was error in such ruling. Nor was there error in overruling a second motion to continue the case, after the making of an amendment to the petition of the plaintiffs.

4. While T. A. Ausley was on the stand as a witness, the presiding judge put to him quite a number of questions in succession. In view of the circumstances of the case, and of the character of the evidence which this witness had previously given, it can not be held that the examination by the judge was either so argumentative in character or contained such expressions or intimations of opinion as to require a new trial. Nor was it error to refuse to grant a mistrial on account thereof. *Gillis* v. *Bowman,* 132 *Ga.* 762 (64 S. E. 1096).

5. The court has some discretion as to the order of trial of cases on its calendar; and the facts of this case do not show that its discretion was abused. Civil Code (1910), § 6284; *Laramore* v. *Chastain,* 25 *Ga.* 592.

6. An agent to buy and resell property for his principals can not lawfully make a secret profit from the transaction. Nor is it necessary to the application of this rule that the principal must show actual or moral fraud. Civil Code (1910), §§ 3582, 3583, 4628; *Hawk* v. *Leverett,* 71 *Ga.* 675; *Dowling* v. *Feeley,* 72 *Ga.* 557. The court can not charge all of the law of the case in one sentence. The charge given on this subject was applicable to one aspect of the case. If the charge here complained of, segregated from the general charge, might have been open to any criticism, it was not error when taken in connection with the general charge.

7. That a trustee who diverts trust property to his own use is liable to his cestuis que trust is clear. Persons who knowingly participate in the diversion are also liable. Relatively to this rule, an agent who fraudulently diverts to his own use property of his principal is a quasi trustee. Civil Code (1910), § 3784; *Shivers* v. *Palmer,* 14 *Ga.* 342; *Bigham* v. *Coleman,* 71 *Ga.* 176; *Ander-*

*son* v. *Foster,* 112 *Ga.* 270 (2), 273 (37 S. E. 426). If as a part of the fraudulent conduct of T. A. Ausley he caused a title to the one-fourth interest to be placed in McCaskill, without consideration, and with knowledge of his fraud McCaskill conveyed it to J. C. Ausley, who, with knowledge, conveyed it to a non-resident purchaser, and T. A. Ausley received the proceeds, it would seem that, by conveying such interest, McCaskill and J. C. Ausley ratified the means by which the title was placed in them. But whether or not ratification was the most appropriate word to use in the charge, they were liable in an equitable action to account to his principals along with T. A. Ausley. Nor would this be prevented either by the admission of counsel that McCaskill was a man of good character, or by the fact that McCaskill acted under the advice of counsel, or that the deed was made by J. C. Ausley after the suit was begun. The limitation upon the extent of the recovery, made in the general charge, was such as to eliminate danger of an excessive recovery.

8. As to the extent of the recovery, the charge limited the jury to stated amounts. A calculation shows that if the plaintiffs were entitled to recover at all, they were entitled to recover at least the amounts to which they were limited by the charge. It may have restricted the plaintiffs' recovery too much. But it was not erroneous as to the defendants.

9. None of the grounds of the motion for a new trial require further discussion or a reversal. The evidence against McCaskill and J. C. Ausley was not as overwhelming as against T. A. Ausley; but it was sufficient to authorize the jury to find against them.

*Judgment affirmed. All the Justices concur.*