32041. METROPOLITAN LIFE INSURANCE COMPANY
v. JOYE.

DECIDED JULY 8, 1948.

*W. W. Alexander, Leonard Farkas, Walter H. Burt,* for plaintiff in error.

*Jesse J. Gainey, Roy Segler,* contra.

PARKER, J. Mrs. Louise F. Joye sued Metropolitan Life Insurance Company on two policies insuring the life of her husband, Charles M. Joye, deceased. The company defended on the ground that the policies were void from their inception because the insured made certain false statements, material to the risks, in his written applications which were made a part of the policies. These statements were that (a) he was in good health; (b) the last time he was sick, suffering with la grippe for a week, was in January 1944; (c) he had not been treated for heart trouble; (d) he never had a disease of the heart; (e) he had no illness or occupational disease; (f) he had not been treated by any physician within the last five years, except by Dr. Reid for la grippe; and (g) had never been told that he had heart trouble; and because the insured wilfully concealed the following facts which enhanced the risks: that (a) he was in bad health; (b) he had been advised by Dr. William W. Jarrell that he had heart trouble, and had been treated by Dr. Jarrell for heart trouble; (c) he had been treated by Dr. Jarrell for stomach trouble or indigestion; (d) Dr. Jarrell had prescribed digitalis for him and rest in bed, and (e) had advised him that he had several heart attacks. The

policies were written on applications dated May 27, 1944 and July 30, 1945, and the statements made in the applications were substantially the same although not exactly alike. The insured died on November 13, 1945, and the cause of death was certified as heart failure, contributing causes cerebral apoplexy.

Dr. William W. Jarrell, the only witness for the defendant testified substantially as follows: "I know Mr. Charles M. Joye. I knew him ever since he had been in Thomasville. As to whether I was his physician prior to May 27, 1944, I do not know now just exactly the date, but I had been his physician, but I was not his physician along towards the end, because my health had begun to fail. As to whether I was his physician in 1943, if my wife were at home and I could get to the books at the house we could see when the last call was made, but I can't recall. As to whether I attended him prior to 1944, you asked me that a minute ago. This letter was written in 1945. I would not know whether I was his physician in 1943, unless I had the books and ledger in my hands. After my wife is out of the hospital, I can get that information for you. It had been about fifteen years before he died when he came to Thomasville, and so far as I know I would say I treated him up to five years before his death. That is purely conjective, I couldn't give an affirmative statement. It has been so long it has gone out of my mind.

"At the time I treated him I diagnosed his condition as myocarditis, on account of the rapidity of his pulse. His pulse was beating about 150 a minute. I prescribed digitalis, and rest. I treated him as a heart patient. Not many of my calls were made at home. Most of them were made at the store. He was a stubborn man. I should say I made, both at home and at the store, approximately six or eight calls. As to whether those visits were made sometime within four years of his death, he died in 1945, and I don't think I attended him within five or six years of his death. It was a long time. Possibly five or six years, yes, with reservation. I have a more definite date on my books and I can give you that date. My best judgment as to when I treated him last before his death is that it was about two years before his death. That was not a heart condition but was for stomach trouble or indigestion.

"I knew Mr. Joye ever since he came to Thomasville, I would

say fifteen years. His reputation in this community was the highest. He was one of the leaders in the new Baptist Church here. When I examined him for heart condition I had my stethoscope, and I counted his pulse. That impressed me particularly. As to whether I usually tell a patient that he has got heart trouble, yes, I do. I am sure that I told him. I don't believe in telling them stories. That is a moot question. As to whether I told him that I might be mistaken, yes, I told him that but I didn't think there was any doubt about it. As to whether I knew that Dr. J. W. Reid had treated him for what is known as flu or grippe, no, I did not. I had heard that Dr. Reid had examined him for insurance. I had heard that since. I know Dr. Reid, and he is a reputable doctor of high standing. I would say that the examination that Dr. Reid would give a patient would be thorough. It wouldn't be successful if it weren't. As to what I would say with reference to my own diagnosis and then the later diagnosis of Dr. Reid and as to whether I could have been mistaken, now I am not fool enough to think that I couldn't be mistaken. I have thought of the case a good deal and with Dr. Reid's subsequent attention to him I arrived at the conclusion that I had been wrong in my diagnosis. You don't attend a man very long after you make a diagnosis like that. He goes to someone else.

"As to whether I treated him for heart trouble about five or six years before he died, now, you are trying to pin me down for a definite time. I had treated him for heart trouble. Yes, I did tell him that he had heart trouble. That was prior to when Dr. Reid became his physician. My records are at home in a ledger and I don't know whether I could find them or not. My wife is in the hospital. I will give you that information after she comes home."

The account of C. M. Joye, taken from the ledger of Dr. Jarrell, was introduced in evidence by the defendant. It showed charges for three calls in August, 1938, one call in August, 1939, and six calls in July, August and September, 1941, at $2 each, totaling $20, all of which were office calls except two in July. After testifying that the book entries were correct, and were the only account he had against Mr. Joye, Dr. Jarrell testified further as follows: "My book of account does not show what per-

son called me or what person I called on as sick. It just shows what I charged to Mr. Joye. I don't know what member of the family might have been sick. The letters 'O. C.' after the dates stand for office calls. My memory is not clear at all—just dismissed from my mind. As between my examination and Dr. Reid's examination, I would take his word for it. It isn't the first mistake I have ever made. I think I might have been wrong. The way the man carried on after that, I don't see how he could have been as sick as he thought he was." Dr. Jarrell also testified that he, referring to himself, had a serious ailment, and was threatened with a ruptured blood vessel in the brain, and had been very ill and that his memory was not as good as it had been. He admitted his signature on a memorandum handed him, dated December 19, 1945, but stated that he could not recall it at all.

Dr. J. W. Reid, a witness for the plaintiff, testified: "I am a physician, and have been a practicing physician since 1921. I have practiced here in Thomasville all the time. I knew Mr. C. M. Joye. As to whether I served as physician for him, I examined him once for life insurance and with Dr. Ferguson I saw him in consultation and treated him during his last illness. Dr. Ferguson was his physician. When I examined him for life insurance I pulled up his shirt and examined his chest. I did examine his heart. I did not find anything the matter. I found, with reference to his heart, a normal heart for a man of his age. That is the only time I remember examining his chest or heart. I perhaps treated him for a cold when there wasn't any examination made of any thoroughness. As to whether I examined him a second time for insurance I remember examining him once for insurance. Looking at this paper, that is my signature and that was May, 1944. Looking at this other paper (handed to the witness by Mr. Gainey) I examined him also in 1945. Both times I took the shirt off and examined the heart and lungs. The heart and lungs appeared to be normal for a man of his age. The heart of a man of Mr. Joye's age would normally beat about 78; get-up, would be a little faster, about 80. Nervousness would make it beat a little faster. As to how fast it could go, that depends on his nervousness, could go so fast you couldn't count it. Anybody's heart beats faster when they are excited. As to

whether it could go that fast without a man having heart trouble, there could be a nervous condition without being heart trouble, it could have been as high as 150 without being heart trouble. Yes, he could have nervous trouble and not heart trouble. The term 'acute' when used with reference to a disease means in contradistinction of chronic. Acute is something that has occurred recently and perhaps violently or suddenly. Acute heart trouble could come on within a minute. Then it may become chronic. An acute attack might kill him. If I may elucidate myself once more, the acute may also pass off and not become chronic, disappear. In a death certificate it would mean it had come on suddenly and killed him.

"I know Dr. William W. Jarrell. He is a competent physician. I would say that a man may have a heart attack and it pass off. In fact, he may have had a heart attack any number of times prior to my examination, say in 1939 or 1941, and it disappeared. In other words, if Dr. Jarrell examined this man, say one, two, three, four, or five years before he examined him, and he diagnosed his case as heart trouble and had treated him for heart trouble it is not necessarily true that he was completely wrong, he could have been right and at the time I examined him I could have been completely right. It is just the matter of interval between the two times of examination."

The jury returned a verdict for the plaintiff on both policies. The defendant moved for a new trial on the general grounds, and on three special grounds alleging error in the charge, and has excepted to the overruling of that motion.

The only question we have to decide, under the general grounds of the motion for new trial, is whether the evidence was sufficient to support the verdict. After verdict that view of the evidence which is most favorable to the prevailing party must be taken, as every presumption and every inference is in favor of the verdict. *Mutual Life Insurance Co.* v. *Barron*, 70 *Ga. App.* 454, 457 (28 S. E. 2d, 334); *Sanders* v. *Chandler*, 71 *Ga. App.* 337, 341 (30 S. E. 2d, 813); *Scott* v. *Imperial Hotel Co.*, 75 *Ga. App.* 91 (42 S. E. 2d, 179); *Gulf Life Ins. Co.* v. *McDaniel*, 75 *Ga. App.* 549, 553 (43 S. E. 2d, 784). In a suit upon an insurance policy the burden of showing that representations made by the insured in his application were material and untrue is on the de-

fendant. *O'Connell* v. *Supreme Conclave,* 102 *Ga.* 143 (2) (28 S. E. 282, 66 Am. St. R. 159). "Questions as to the truth and materiality of representations are generally issues of fact, for determination by the jury." *Life Insurance Co. of Va.* v. *Pate,* 23 *Ga. App.* 233 (3) (97 S. E. 874); *New York Life Insurance Co.* v. *Watson,* 48 *Ga. App.* 211 (172 S. E. 602).

The defendant relies upon *Preston* v. *National Life &c. Ins. Co.,* 196 *Ga.* 217 (26 S. E. 2d, 439, 148 A. L. R. 897); also reported in 68 *Ga. App.* 614 (23 S. E. 2d, 526); *National Life &c. Ins. Co.* v. *Roberts,* 60 *Ga. App.* 317 (3 S. E. 2d, 761); *New York Life Insurance Co.* v. *Hollis,* 177 *Ga.* 805 (171 S. E. 288), and other cases in which like rulings have been made. Where the application is attached to and made a part of the policy, as in this case, and false statements or representations are contained in such application, as a result of which the risk is increased, a recovery on the policy may be defeated on such grounds whether the statements and representations were made in good faith or fraudulently. Code, §§ 56-904, 56-908. "The test in such case is not whether the matter represented shall have actually contributed to the contingency or event on which the policy is to become payable, but is whether it changed the nature and character of the risk and increased it as against the insurer under the particular policy; and by *increase in risk* is meant an increase that is at least substantial. While a false statement as to consultation or treatment for a slight or trivial ailment may not, without more, be considered as a material misrepresentation, so as to avoid the policy, yet the illness need not be shown to have been serious, the true criterion being, as in case of misrepresentations as to other matters, substantial increase in risk." *Preston* v. *National Life &c. Ins. Co.,* 196 *Ga.* 217 (4, 5) (supra).

The cases cited by the defendant are based on their particular facts, and recoveries were denied where it clearly appeared from uncontradicted evidence that false statements or representations, under which the risk was increased, were made in the application. The trouble with the defendant's defense in this case is the evidence and not the law. The only witness (Dr. Jarrell) by whom the defendant sought to prove the falsity of statements in the applications, of such nature that they were calculated to increase the risk of the company, admitted that his own health was very

bad, that his memory was not good, and that he diagnosed the condition of the insured as myocarditis on account of the rapidity of his pulse, and by counting his pulse which was very rapid, and it was this fact that impressed him particularly. He testified that he told the insured that he had heart trouble, but also told him that he might be mistaken. He then stated that, "I have thought of the case a good deal and with Dr. Reid's subsequent attention to him I arrived at the conclusion that I had been wrong in my diagnosis," and "it isn't the first mistake I have ever made. I think I might have been wrong." Dr. Reid testified to a thorough examination of the deceased on two occasions, including his chest and heart, without finding any trouble, and that he found that the deceased had a normal heart for a man of his age. He explained also that a person might be highly nervous, so much so that excitement could cause the pulse to beat rapidly, so fast that you couldn't count it, without having heart trouble. The testimony of Dr. Jarrell was more or less equivocal and conflicting and tended to discredit itself, and construed as a whole, along with the testimony of Dr. Reid, it was not sufficient to demand a finding that the representations in the applications were false, and resulted in an increase in the risks. We think the jury, the sole judges of the credibility of the witnesses, and without any disparagement on moral grounds of the testimony of Dr. Jarrell, were authorized to find that his evidence was not conclusive on the issues as to false statements of the insured and their materiality. The jury are not bound in every case to accept evidence as true although it is not contradicted by direct testimony. It may be inherently subject to discredit, or so from the circumstances surrounding it. These principles are recognized in *Haverty Furniture Co.* v. *Calhoun,* 15 *Ga. App.* 620 (84 S. E. 138); *Redd* v. *Lathen,* 32 *Ga. App.* 214 (123 S. E. 175); *Whiddon* v. *Hall,* 155 *Ga.* 570, 578 (118 S. E. 347), and *Lewis* v. *Patterson,* 191 *Ga.* 348, 357 (12 S. E. 2d, 593).

As to the general grounds of the motion, the jury was authorized to find that the defendant did not carry the burden of showing that false statements enhancing the risks were made by the insured in his applications on which the policies were issued, so as to defeat a recovery thereon.

■ Special ground 1 complains of the following excerpt from

the charge of the court: "To defeat liability under a policy on account of misrepresentation, it must be shown first, that the statement made was material to the acceptance of the risk; second, that the representation was false; and third, that the representation was made with intent to defraud. A material representation is one that would influence a prudent insurer in determining whether or not to accept the risk, or in fixing the amount of the premium in the event of acceptance."

Ground 2 complains of this excerpt from the charge: "Where an application for life insurance is attached to and made a part of the policy any misrepresentation in the application which changes the nature and character of the risk as contemplated in the policy may defeat a recovery, regardless of good faith on the part of the insured. The test in such case is not whether the matter represented shall have actually contributed to the contingency or event, on which the policy is to become payable, but is whether it changed the nature and character of the risk and increased it as against the insurer under the particular policy; and by increase in risk is meant an increase that is at least substantial."

The court charged the Code, §§ 56-820, 56-821 and 56-908 immediately before the excerpts on which error is assigned. The defense of the company was based on alleged false statements material to the risks, made in the applications which were parts of the policies, and on alleged wilful concealments of facts which enhanced the risks of the company. The defense of wilful concealment was in effect a restatement of the allegations of false statements, as both the alleged statements and concealments related to the same matters. A false statement necessarily includes a concealment of the true facts. The court charged fully on the subject of misrepresentations, and that any misrepresentations in the applications which changed the nature and character of the risks may defeat a recovery, regardless of the good faith of the insured. The jury found that no such misrepresentations had been made, and the failure to charge that a concealment of a material fact, if not done fraudulently would not void the policy, was not harmful error. In other words, the defense of misrepresentation, under the facts of this case, which would have voided the policies if the jury had found with the company on that issue,

necessarily included the other defense of wilful concealment, which would not have voided the policies unless it was fraudulent. Under these circumstances, and in the absence of any request to charge more fully, these grounds show no reversible error.

■ Special ground 3 complains of the failure of the court to charge that a wilful concealment of a material fact which would enhance the risks would void the policies. For the reasons stated in division 2, this ground of the motion is without merit.

The verdict was authorized under the evidence, and has the approval of the trial judge, and in the absence of any error of law the motion for new trial was properly overruled.

*Judgment affirmed. Sutton, C. J., and Felton, J., concur.*